Erika Birch (Bar No.7831)
T. Guy Hallam (Bar No. 6101)
**STRINDBERG & SCHOLNICK, LLC**
802 W. BANNOCK STREET, SUITE 308
BOISE, ID 83702
(t) 208.336.1788
(f) 208.287.3708
*erika@idahojobjustice.com*
*guy@idahojobjustice.com*

Attorneys for Plaintiff

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| **JAMES CRYER,**<br><br>    Plaintiff,<br><br>vs.<br><br>**IDAHO DEPARTMENT OF LABOR, an executive department of the state of Idaho, KENNETH D. EDMUNDS, Director, in his official and individual capacity; JAY ENGSTROM, Chief Operating Officer, in his official and individual capacity; and MICHAEL KALM, in his individual capacity.**<br><br>    Defendants. | **COMPLAINT AND DEMAND FOR JURY TRIAL**<br><br>Civil No.: |

Plaintiff James Cryer ("Mr. Cryer"), by and through his attorneys, hereby complains against Defendants Idaho Department of Labor, Kenneth D. Edmunds, Jay Engstrom, and Michael

Kalm (collectively "Defendants") as follows. Mr. Cryer was a dedicated and successful IDOL employee for nearly 23 years. In June of 2016 he was fired after having raised concerns on multiple occasions, to multiple individuals, and in multiple ways that employees at IDOL were violating state purchasing laws, rules and regulations, committing violations of personnel and employment laws, rules and regulations, and wasting government resources. IDOL's termination of Mr. Cryer violates Idaho's whistleblower law and the First Amendment's guarantee of free speech. Additionally, IDOL violated the Fourth Amendment when it sent two subpoenas to Mr. Cryer's cell phone carrier, Verizon, demanding documents related to his personal cell phone usage. These subpoenas were wholly unauthorized, submitted under a fictitious case name and number, and without probable cause.

## I.   NATURE OF THE CLAIMS

This suit is brought under 42 U.S.C. § 1983 ("§ 1983") for Defendant's violation of Mr. Cryer's free speech rights under the United States Constitution and for illegal retaliation under the Idaho Protection of Public Employees Act. Additionally, Defendants violated Mr. Cryer's privacy rights and his right to be free from unreasonable search and seizure when Defendants authorized fictitious subpoenas for his personal cell phone records. Plaintiff seeks all available remedies including equitable relief, damages, attorneys' fees, costs, and interest.

## II.   PARTIES

1.   Defendant Idaho Department of Labor is an executive department of the State of Idaho pursuant to section 20, article IV of the Idaho Constitution. I.C. § 67-2404.

2.   Defendant Kenneth Edmunds is the Director of the IDOL and upon information and belief is a resident in Ada County, Idaho.

3. Defendant Jay Engstrom is the former Chief Operating Officer ("COO") for the IDOL and upon information and belief is a resident in Ada County, Idaho.

4. Defendant Michael Kalm is the Chief Technology/Security Officer for IDOL and upon information and belief is a resident in Ada County, Idaho.

5. Plaintiff, James Cryer, is a citizen of Idaho living in Ada County and at all times relevant herein was an employee of the State of Idaho, Department of Labor.

### III.   JURISDICTION AND VENUE

6. This Court has original jurisdiction under the provisions of 28 U.S.C. § 1331 with respect to Plaintiff's claims arising under federal law. This Court has concurrent jurisdiction over Plaintiff's state law claims under the provisions of 28 U.S.C. § 1367.

7. Venue is proper with this Court as Defendant, Idaho Department of Labor is located in Idaho, and the illegal conduct occurred within the jurisdiction of this Court.

### V.   GENERAL ALLEGATIONS

8. IDOL employed Mr. Cryer for nearly 23 years.

9. As reflected in his personnel file, IDOL considered Mr. Cryer's job performance to meet, and more often than not exceed, performance expectations year after year.

10. Mr. Cryer was incredibly effective at taking over troubled or unproductive units and creating efficiencies, finding costs savings, and improving the agency business processes.

11. IDOL promoted and/or asked Mr. Cryer to take on additional responsibilities on several occasions throughout his tenure. For example, in the late 1990s he was promoted to a leadership role within the imaging department.

12. Mr. Cryer was working as the Imaging Program Manager and the State of Idaho Work Opportunity Tax Credit "WOTC" Coordinator when Joni Booth, Financial Executive Officer, and

Jay Engstrom, then COO, asked Mr. Cryer if he would start helping out in the IDOL purchasing unit of the accounting bureau in late 2014.

13. IDOL was aware that Mr. Cryer had previous purchasing experience and specialized training including graduating through the State of Idaho's Certified Public Manager Program.

14. Early in 2015, it was decided that Mr. Cryer would take over as IDOL's purchasing agent upon the retirement of long-time employee Jade Bacus. Mr. Cryer and Ms. Bacus worked together in the IDOL purchasing department until her last day on April 30, 2015.

15. While working in purchasing, Mr. Cryer was informed that several IDOL employees regularly attempted to make purchases that were not compliant with state purchasing rules and regulations. The IDOL employees who routinely violated State purchasing rules and regulations included Defendant Michael Kalm, Chief Security Officer, and John Brown, IT Resource Manager, and Erik Beck, the IT bureau Manager, who at minimum condoned the illegal behaviors.

16. For example, Kalm and Brown submitted multiple purchasing requests for an Uninterrupted Power Supply (UPS), costing approximately $110,000, suggesting that it was a covered product on the State's contract with Dell.

17. However, Brown and Kalm had been advised on several occasions that in fact the UPS was not on the Dell contract and that the Division of Purchasing (DOP) would require a competitive bidding process.

18. Additionally, it appeared from the purchasing quote that the UPS equipment would actually be purchased from a company called Schneider Electric and not Dell. Mr. Cryer had heard from other IDOL employees that Kalm frequently made or directed purchases be made from vendors with whom he had some personal connection with. Thus Mr. Cryer was concerned that Kalm might

be attempting similar preferential purchasing with the UPS, in violation of State regulations and rules.

19. Mr. Cryer raised concerns about Kalm's multiple UPS purchase requests, and what appeared to be a quote from a company posing to be associated with Dell, to both employees at IDOL and also employees at DOP.

20. Kalm tried to convince Mr. Cryer to just make the purchase, without further inquiry, by telling him that the UPS was part of the security contract. Mr. Cryer was not willing to move forward with the UPS purchase unless the competitive bidding process was followed.

21. In December, 2015, after several failed attempts to purchase the UPS without using the competitive bidding process, Kalm and/or Brown once again submitted a quote for the UPS purchase without involving Mr. Cryer. When Mr. Cryer was notified of the impending UPS purchase and inquired, he was told that a Department of Administration employee, Rachel Zahn, had requested that the UPS be added to the Dell contract.

22. Mr. Cryer then learned from various individuals that Rachel Zahn was in a romantic relationship with Kalm. Despite the fact that she worked for the Department of Administration, Zahn also had been seen working with IDOL IT bureau employees, including Kalm. In fact, shortly after the UPS purchase went through, Zahn was officially hired at IDOL. She became the IDOL's Cybersecurity Unit Manager and reported to directly to Kalm.

23. Mr. Cryer had also begun noting other purchasing discrepancies including purchases made by IDOL IT employees using the P-card of Eric Beck, the head of IT bureau, instead of using the state required purchasing contracts.

24. Mr. Cryer communicated often with personnel within the DOP to question past, present and future purchases made at IDOL. Mr. Cryer's understanding that purchases at IDOL, and in

particular by IT bureau employees including Kalm, violated state purchasing laws and regulations/rules, was confirmed by DOP personnel.

25. After violations of purchasing rules and laws were discovered and disclosed by Mr. Cryer, individuals within the IT bureau were directed, on December 6 and 7, 2015, to first email Mr. Cryer about needed purchases so that he could ensure that items on State contracts were purchased appropriately. They were also told that purchases using Beck's P-Card would be "closely monitored," and they were reminded that all purchases must comply with state policies.

26. On December 10, 2015 Mr. Cryer emailed several IDOL employees including Beck, to reiterate that several recent purchases did not comply with DOP rules. In this email, Mr. Cryer provided the Idaho Code provision limiting purchases in the open market to emergency purchases, I.C. § 67-5720. He also expressed his unwillingness to process payments for non-compliant purchases.

27. IDOL continued to violate the State purchasing rules and laws. For example, Mr. Cryer discovered that IT was purchasing thumb drives, memory cards and batteries using the P-card or by paying cash and asking for reimbursement. Mr. Cryer confirmed that these purchases were to be made on the State's mandatory contract with OfficeMax.

28. Some employees within the IDOL were not happy to have their purchasing habits questioned or scrutinized. IDOL employees were also displeased when they were told to complete the required process of complying with the State purchasing rules and laws.

29. This unhappiness was expressed on multiple occasions. For example, in January 2016 Kalm complained to John Taylor, newly promoted Financial Executive Officer, who had replaced Joni Booth once she retired. Taylor was a manager in Mr. Cryer's chain of command. Kalm

expressed to Taylor that he was frustrated in having to follow the purchasing rules regarding a DVI display cable, used to connect a computer to a television screen, saying:

> The cost of the numerous people involved in purchasing a $10 cable and waiting weeks to have it installed, instead of having one of the techs being able to go down the street and pick it up and have it installed in less that [sic] 30 mins not to mention the lack of customer service . . .

30. Taylor then confronted Mr. Cryer about why he was being so "stringent" about making purchases and that "it wasn't providing good customer service." Mr. Cryer attempted to explain to Taylor that he was just following the State's purchasing laws and rules. In response, Taylor said that there must be something Mr. Cryer just did not understand about the purchasing rules.

31. After this confrontation, Mr. Cryer sent Taylor information about the purchasing laws and regulations. Taylor then called for a meeting with Mr. Cryer, and invited Defendant Kalm and Brown. During this meeting, they all questioned Mr. Cryer about their perception that he was being too "militant" in making employees following the purchasing rules and regulations. They again told Mr. Cryer that he must just not understand the law.

32. Mr. Cryer then tried to arrange for a meeting with DOP officials and Taylor so they could help him educate Taylor about the purchasing laws and regulations.

33. Instead of agreeing to meet with DOP officials, Taylor scheduled another meeting with Mr. Cryer, once again inviting Defendant Kalm, and this time also inviting Defendant Engstrom, the COO (second-in-command official at IDOL).

34. During this meeting, Taylor questioned Mr. Cryer about using the emergency acquisition exception to be able to get day-to-day items needed. Mr. Cryer explained that the emergency exception was extremely narrow and had certain procedures that must be followed to be lawfully invoked. He offered to forward to Engstrom the same information about emergency procedures he had already sent to Taylor. Mr. Cryer also reminded Engstrom that he was only doing what

COMPLAINT AND DEMAND FOR JURY TRIAL - 7

Engstrom had asked of Mr. Cryer when he went into the purchasing unit – to "buy the things we need, [and] keep them within the rules and the law."

35. After this meeting, Taylor told Mr. Cryer that Engstrom thought Mr. Cryer just had a problem working with Kalm.

36. It was clear from these successive meetings with Taylor, and then Engstrom, that upper management at IDOL was not interested in supporting Mr. Cryer's unwillingness to bend the State's purchasing laws and rules.

37. Throughout this same timeframe, Mr. Cryer also had a good faith concern that Kalm, who was a frequent abuser of the purchasing rules, was also committing violations of personnel rules and/or was wasting government resources related to employment-related decisions within the IDOL IT bureau.

38. For example, Kalm's involvement in the hiring of Zahn as referenced above, while the two employees were involved in a romantic relationship, and then promoting her and having her report directly to him, violated, or was suspected to have violated, personnel rules regarding merit hiring, recruitment, and conflicts of interest.

39. Kalm's hiring of Zahn was not the only hiring decision that was concerning. Kalm had hired other friends under circumstances that violated, or were suspected to have violated, personnel rules regarding merit hiring, recruitment, and conflicts of interest.

40. For example, upon information and belief, Kalm had a retiring employee work as a contractor instead of an employee so that Kalm could permanently hire his friend, John Brown, who had been previously working for IDOL as a temporary employee. Kalm then hired Brown's daughter, and later promoted her so that she reported directly to Kalm.

41. Mr. Cryer believed that his complaints about violations of the purchasing rules had not been taken seriously, and that he was being scrutinized and pressured to be more flexible with the rules and laws in the name of providing "good customer service." For example, upon information and belief, Kalm began blaming Mr. Cryer for holding up acquisitions even where Kalm had not submitted requests for purchasing.

42. Thus, in addition to raising concerns about violations of law, rule or regulation with individuals within IDOL and DOP, Mr. Cryer also sent several anonymous emails hoping it would spur officials to take appropriate action to stop and cure these violations.

43. Mr. Cryer sent seven (7) such anonymous emails to various individuals both inside and outside IDOL including emails to: Jay Engstrom, former COO at IDOL; Geri Murrey, Human Resources Manager at IDOL; Sarah Hildebrant, DOP Administrator; and, Susan Buxton, Idaho Division of Human Resources Administrator. Some emails were sent in December of 2015 and others in April of 2016.

44. Instead of investigating the validity of the anonymous complaints or taking measures to address the allegations of illegal activity, IDOL chose to target the messenger.

45. Upon information and belief, Kalm began culling through employee's cell phone records to see if he could identify clues about the sender of the anonymous emails.

46. On April 28, 2016, IDOL created a fake case name and number and "issued" a subpoena duces tecum for records from Verizon Wireless as an attempt to identify who was sending the anonymous emails.

47. The subpoena was stamped with the Director's signature and requested that the documents be sent to Zahn.

48. Upon information and belief, on or about May 9, 2016 Verizon emailed to Zahn a list of all subscriber wireless numbers which corresponded with the dates, times and IP addresses associated with the anonymous emails.

49. IDOL reported that on May 9, 2016 it received report from Verizon indicating that Mr. Cryer was the one sending the anonymous emails from his cell phone.

50. That same day, on May 9, IDOL sent a second subpoena asking Verizon to produce documents related specifically to Mr. Cryer's cell phone number.

51. IDOL then placed Mr. Cryer on administrative leave pending an investigation on May 9th, but refused to provide him with any information regarding what the investigation was about.

52. Mr. Cryer was later contacted by a Deputy Attorney General who scheduled an interview with him on June 1, 2016. During this investigation interview, Mr. Cryer was provided copies of the anonymous emails and questioned about them. Upon questioning, Mr. Cryer was immediately forthright and answered honestly that he had in fact been the sender of the anonymous emails.

53. Mr. Cryer also explained why he had sent the anonymous emails, including providing details about the history of perceived illegal activities that had gone unaddressed and pointing out that he was being subjected to heightened scrutiny and pressure because of his insistence that IDOL follow State law and rules.

54. On June 14, 2016 Mr. Cryer was notified that IDOL was considering terminating his employment based upon having sent the anonymous emails. IDOL asserted that it interpreted one of Mr. Cryer's April 26th emails as a threat to Engstrom and the IDOL IT bureau. IDOL accused Mr. Cryer of causing a major disruption and significant redirecting of resources to deal with the "threat" appropriately. Further, IDOL concluded that his conduct resulted in an "irreparable breach of trust" that the Department placed in him.

55. IDOL only provided Mr. Cryer until 8:00 am on June 16, to respond to the notice despite the fact that the Department of Human Resources recommends a minimum response time of at least three (3) working days.

56. Mr. Cryer responded to this notice by once again explaining how he felt "trapped and singled out for insisting . . . purchasing guidelines set forth by law" were followed. Mr. Cryer reiterated that his intent was only to point out the concerns he had about illegal purchases, personnel violations, and ethical violations. Mr. Cryer insisted that he meant no threat to anyone other than to bring to light the illegal and unethical behaviors at IDOL.

57. On June 23, 2016 IDOL Director Edmunds terminated Mr. Cryer for having sent the anonymous emails, alleging that it was "conduct unbecoming a state employee or conduct detrimental to good order and discipline in the Department."

58. IDOL confirmed that there was no prior history of concerns with Mr. Cryer's behavior or conduct, and that he had never received any warnings regarding outbursts or unruly behavior. In fact, his direct supervisor rated him as exceeding performance expectations in late April just a few weeks before his was put on leave pending the investigation, and then fired.

59. The day after Mr. Cryer's termination, a colleague of his and an employee within the IT bureau, was also placed on administrative leave pending an investigation.

60. As with Mr. Cryer, IDOL assigned a Deputy Attorney General to interview this employee. Just like Mr. Cryer, this employee raised concerns about perceived illegal and unethical conduct taking place at IDOL including specifically with Kalm's actions and behaviors with respect to personnel decisions and purchasing.

61. On August 4, 2016, Kalm was told by Beck that: he was eliminating Kalm's direct supervision of subordinates; that Kalm was not to be involved with ordering, receiving, inventory

tagging or installation of items IDOL purchases; that Kalm should refrain from initiating or approving Purchasing Requests; and, that Kalm was not allowed to use Beck's P-card for any purpose, whatsoever.

## FIRST CLAIM FOR RELIEF
### (Violation of the Idaho Protection of Public Employees Act against Defendants IDOL, Edmunds, and Engstrom)

62. Mr. Cryer alleges and incorporates by reference all of the paragraphs and allegations set forth above.

63. Defendant IDOL is an "Employer" under the Idaho Protection of Public Employees Act pursuant to I.C. § 6-2102(4)(a).

64. Defendants Edmunds and Engstrom are also "Employers" pursuant to § 6-2102(4)(a) as they are agents of the IDOL and made the ultimate termination decision.

65. As alleged above, Mr. Cryer engaged in protected activity under I.C. §6-2104(1)-(3) when he: (1) communicated in good faith the existence of waste of public funds, property or manpower or violation or suspected violation of law, rule or regulation; (2) participated in an investigation by the Deputy Attorney General regarding the anonymous emails; and (3) objected to and/or refused to carry out directives that he reasonably believed violated law or rule of regulation.

66. As a result of Mr. Cryer's protected activity, Defendants took adverse actions against him including subjecting him to intimidation, issuing fictitious subpoenas for his cell phone records, and eventually by terminating his employment, all in violation of I.C. §6-2104.

67. Mr. Cryer has been damaged as a result of Defendants' retaliation. He is entitled to recover all resulting damages including lost pay and benefits, future lost pay and benefits, and emotional distress damages pursuant to I.C. § 6-2105.

68.     Mr. Cryer is also entitled to all reasonable attorney's fees and costs incurred in bringing this action pursuant to I.C. § 6-2105.

## SECOND CLAIM FOR RELIEF
### (Violation of Mr. Cryer's Right to Free Speech in Violation of 42 U.S.C. § 1983 Against Defendants Edmunds and Engstrom in their individual and official capacities)

69.     Mr. Cryer alleges and incorporates by reference all of the paragraphs and allegations set forth above.

70.     As set forth above, Mr. Cryer sent several anonymous emails raising matters of public concern about possible violations of law, rule or regulation, and/or waste of governmental resources.

71.     When Mr. Cryer sent these anonymous emails, he was acting as a private citizen, and was not acting or operating pursuant to his official duties.

72.     Mr. Cryer's protected speech was the reason provided as support for Defendants' decision to terminate his employment.

73.     By terminating Mr. Cryer, Defendants violated his rights as protected under the First Amendment to the United States Constitution.

74.     Defendants acted under color of law.

75.     Defendants were personally involved in making the decision to terminate Mr. Cryer.

76.     Defendants' conduct violated a clearly established constitutional right of free speech of which a reasonable person should have known.

77.     Mr. Cryer has been injured by Defendants' conduct and has suffered and will continue to suffer losses. Pursuant to 42 U.S.C. § 1983, he is entitled to all available relief, including back pay, reinstatement and/or front pay, and actual and compensatory damages, as well as costs and attorney fees.

78. The individual Defendants' conduct was willful and intentional, malicious, and exhibits reckless or callous indifference to Mr. Cryer's constitutional rights, thereby entitling him to punitive damages.

### THIRD CLAIM FOR RELIEF
**(Violation of Mr. Cryer's Privacy Rights under the Fourth Amendment in Violation of 42 U.S.C. § 1983 Against Defendants Edmunds and Engstrom in their individual and official capacities, and Defendant Kalm in his individual capacity)**

79. Mr. Cryer alleges and incorporates by reference all of the paragraphs and allegations set forth above.

80. Mr. Cryer had a reasonable expectation of privacy that his communications made with his private cell phone would not be gathered by the government without his consent and/or without a showing of probable cause.

81. Defendants violated that expectation of privacy when it created a fictitious case name, number and caption, and issued a subpoena to Verizon Wireless requesting records including records specifically related to Mr. Cryer's cell phone number.

82. Defendants acted under color of law.

83. Defendants were supervisors and were either personally involved in the unconstitutional acts and/or: helped set in motion the series of unconstitutional acts; knowingly refused to terminate the series of acts which they knew or reasonably should have known would cause others to inflict constitutional injury; failed to provide adequate training, supervision or control of subordinates committing unconstitutional acts; and/or, acquiesced in the constitutional deprivations.

84. Defendants' conduct violated a clearly established constitutional right of privacy of which a reasonable person should have known.

85. Mr. Cryer has been injured by Defendants' conduct and has suffered and will continue to suffer losses. Pursuant to 42 U.S.C. § 1983, he is entitled to all available relief, including back pay,

reinstatement and/or front pay, and actual and compensatory damages, as well as costs and attorney fees.

86.     The individual Defendants' conduct was willful and intentional, malicious, and exhibits reckless or callous indifference to Mr. Cryer's constitutional rights, thereby entitling him to punitive damages.

### FOURTH CLAIM FOR RELIEF
**(Violation of Mr. Cryer's Fourth Amendment Right to be Free from Unreasonable Search and Seizure in Violation of 42 U.S.C. § 1983 Against Defendants Edmunds, Engstrom in their individual and official capacities and Defendant Kalm in his individual capacity)**

87.     Mr. Cryer alleges and incorporates by reference all of the paragraphs and allegations set forth above.

88.     Mr. Cryer had a reasonable expectation to be free from unreasonable searches or seizures under the Fourth Amendment of the United States Constitution.

89.     By creating a fictitious case name, number and caption and issuing a subpoena to Verizon Wireless requesting records including records specifically related to Mr. Cryer's cell phone number, Defendants conducted an unreasonable search and seizure without probable cause.

90.     Defendants acted under color of law.

91.     Defendants were supervisors and were either personally involved in the unconstitutional acts and/or: helped set in motion the series of unconstitutional acts; knowingly refused to terminate the series of acts which they knew or reasonably should have known would cause others to inflict constitutional injury; failed to provide adequate training, supervision or control of subordinates committing unconstitutional acts; and/or, acquiesced in the constitutional deprivations

92.     Defendants' conduct violated a clearly established constitutional right to be free from unreasonable searches and seizures of which a reasonable person should have known.

93. Mr. Cryer has been injured by Defendants' conduct and has suffered and will continue to suffer losses. Pursuant to 42 U.S.C. § 1983, he is entitled to all available relief, including back pay, reinstatement and/or front pay, and actual and compensatory damages, as well as costs and attorney fees.

94. The individual Defendants' conduct was willful and intentional, malicious, and exhibits reckless or callous indifference to Mr. Cryer's constitutional rights, thereby entitling him to punitive damages.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully requests that the Court enter judgment in his favor and against Defendants, and award the following relief.

   a. Back pay and benefits, in amounts to be determined at trial;

   b. Compensatory (emotional distress) and consequential damages;

   c. Punitive damages as allowable;

   d. Front pay and benefits in lieu of reinstatement;

   e. Injunctive and/or declaratory relief;

   f. Pre-judgment and post-judgment interest at the highest lawful rate;

   g. Attorneys' fees and costs of this action, including expert witness fees, as appropriate;

   h. An offset to his increased tax burden; and,

   i. Any such further relief as justice allows.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

Dated this 7th day of December, 2016.

                                           **STRINDBERG & SCHOLNICK, LLC**

                                           <u>/s/ Erika Birch</u>
                                           Erika Birch
                                           Guy Hallam
                                           Attorneys for Plaintiff