UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| JAMES CRYER,<br><br>    Plaintiff,<br><br>    v.<br><br>IDAHO DEPARTMENT OF LABOR, et al.,<br><br>    Defendants. | Case No. 1:16-cv-00526-BLW<br><br>MEMORANDUM DECISION AND ORDER |

## INTRODUCTION

Pending before the Court are Defendants' Motion for Summary Judgment (Dkt. 51) and Plaintiff's Motion for Partial Summary Judgment (Dkt. 45). At a hearing on May 25, 2018, the Court denied Defendants' motion in part, granted Plaintiff's motion in part, and reserved ruling on the remainder of the parties' motions. For the reasons stated below, the Court will now deny the remainder of Defendants' motion, and will deny in part and grant in part the remainder of Plaintiff's partial motion.[1]

## BACKGROUND

### 1.    Factual Background

Plaintiff James Cryer was hired by the Idaho Department of Labor ("IDOL") in 1993. *Birch Decl.* Ex. E at 17:20-23, Dkt. 47-5 ("Cryer Dep."). Defendant IDOL is an executive department of the state of Idaho. *First Amended Compl.* ¶ 1; *Ans.* ¶ 2.

---

[1] The Court will also address Defendants' pending Motion to Strike (Dkt. 45) and Plaintiff's Motions to Exceed Page Limits (Dkts. 48, 56).

Defendant Kenneth Edmunds was the Director of IDOL, and Defendant Jay Engstrom was IDOL's Chief Operating Officer. *Birch. Decl.* Ex. M, Dkt. 47-13 ("Org. Chart"). Defendant Michael Kalm was the Chief Technology/Security Officer at IDOL. *Id.*

In 2014, Mr. Cryer was asked to take on purchasing duties at IDOL. *Cryer Dep.* at 24:18-20, Dkt. 47-5. At that time, Defendant Engstrom informed Mr. Cryer that his duties would entail "buy[ing] the things that we need with the littlest amount of intervention [and] keep[ing] us within the rules and within the laws." *Cryer Dep.* at 25:3-6, Dkt. 47-5. During his time in the purchasing department, Mr. Cryer alleges that he became suspicious that IT department employees had engaged in various measures to circumvent mandatory purchasing rules regarding state contracts. Mr. Cryer further alleges that he communicated his suspicions to various persons at IDOL and at other relevant agencies, and that he refused to approve purchases that he believed would violate state law. Mr. Cryer alleges that he was terminated from IDOL in retaliation for these activities, as well as for sending seven anonymous emails raising concerns about purchasing and hiring practices at IDOL.

### A.    *Purchasing Violations*

Mr. Cryer alleges three specific incidents where he suspected IDOL employees were attempting to circumvent the purchasing rules. In 2015, the IT department submitted a request to Mr. Cryer to purchase an uninterrupted power source ("UPS"). *Birch Decl.* Ex. N, Dkt. 47-5. After consulting with the Idaho State Division of Purchasing ("DOP"), Mr. Cryer determined that the UPS was not on a state contract, and that it could not be purchased without going through a bid process. *Cryer Dep.* at 90:2-9, Dkt. 47-5. When he

informed the IT department, he received a second request accompanied by a "spec sheet" stating that the UPS was a Dell product. *Id.* at 90:9-16. IDOL had a contract with Dell at the time, and Mr. Cryer suspected that someone had cut and pasted the Dell logo onto the document, in an attempt to avoid the bid process. *Id.* Despite this, he processed the request and submitted the order to DOP. *Id.* DOP informed Mr. Cryer again that the UPS was not on a state contract, which Mr. Cryer then relayed again to the IT department. *Id.* at 90:16-19.

Sometime afterwards, Mr. Cryer received a third request from IT to purchase the UPS, which explicitly stated that the UPS was on the Dell contract. *Id.* at 90:20-21. He then looked for the UPS on the Dell contract and could not find it. *Id.* at 90:22. On July 24, 2015, Mr. Cryer emailed Shawna West, a buyer at DOP, to confirm whether he could purchase the UPS. *Birch Decl.* Ex. N at 3, Dkt. 47-14; *Birch Decl.* Ex. O at 5, Dkt. 49. The email stated "Before I spend a [sic] 100,000 I want to be sure I am even supposed to buy this item. Apparently Dell is saying it is part of their contract but I am not finding it. Could you tell me if it is on the contract before I buy this." *Id.* The DOP confirmed again that the UPS was not on contract, but then worked to add it to the Dell contract. *Id.* at 1; *Cryer Dep.* at 90:23-91:3, Dkt. 47-5. Mr. Cryer approved the purchase of the UPS once it was added to the Dell contract. *Cryer Dep.* at 90:23-91:3, Dkt. 47-5.

In another incident, Mr. Cryer received a request to purchase a certain cable. *Id.* at 108:9-10. Mr. Cryer determined that the cable was on a Dell parts contract. *Id.* and relayed that information the requestor, stating that it would take a couple days to obtain. *Id.* at 108:24-109:2. On January 20, 2016, Defendant Kalm emailed John Taylor, the

Financial Executive Officer at IDOL, regarding "[t]he cost of the numerous people involved in purchasing a $10 cable and waiting weeks to have it installed, instead of having one of the techs being able to go down the street and pick it up and have it installed in less that [sic] 30 mins not to mention the lack of customer service…". *Birch Decl.* Ex T, Dkt. 49-5. Mr. Taylor forwarded the email to Mr. Cryer and asked how long it would take to get the cable. *Id.* Mr. Cryer responded that IDOL was obligated to purchase the cable from the contract. *Cryer Dep.* at 109:15-19, Dkt. 47-5. Mr. Taylor reprimanded him for his tone, and told Mr. Cryer "to work with our internal customers." *Id.* at 109:21-110:7; *Taylor Dep.* at 60:17-61:6, Dkt. 47-12. Mr. Cryer informed Mr. Taylor that this was not the first time he'd had to defend himself for requiring purchases to be made on contract. *Cryer Dep.* at 110:1-7, Dkt. 47-5.

Mr. Taylor held a meeting with Mr. Cryer, John Brown, and Defendant Kalm to discuss the cable and the purchasing rules. *Taylor Dep.* at 112:8-114:17, Dkt. 47-12. Mr. Brown was IDOL's IT Resource Manager. *Amend. Compl.* ¶ 12. Mr. Taylor informed Mr. Cryer that he must be misinterpreting the rules. *Id.* Defendant Engstrom also spoke with Mr. Cryer about the cable, telling him, "Let's move this thing along if at all possible. Let's just get the cable and give it to him." *Engstrom Dep.* at 67:21-23, Dkt. 47-7.

On January 21, 2016, Mr. Cryer emailed Chelsea Cameron, a Purchasing Officer in DOP, seeking clarification on whether the cables needed to be purchased through state contract. *Birch Decl.* Ex. U, Dkt. 49-6. Ms. Cameron did not answer whether the cable was on contract, but she confirmed that most items on open contracts are "mandatory use," "regardless of dollar amount." *Id.* Ms. Cameron also noted that "[t]here are

statutory penalties (enforced against the individual employee) for failure to utilize an open contract, regardless of dollar amount." *Id.* The cable was eventually purchased through the Dell contract. *Taylor Dep.* at 39:22-24, Dkt. 47-12.

Finally, Mr. Cryer suspected that Eric Beck, the IDOL Information Technology Chief Information Officer, had violated rules governing the use of purchasing cards ("P-cards") by allowing other staff to use his P-card to make purchases. *Org. Chart*, Dkt. 47-13; *Cryer Dep.* 62:10-22, Dkt. 47-5. On November 25, 2015, Mr. Cryer emailed Jason Urquhart, a Purchasing Officer at DOP, stating "I was told to contact you and let you know, the attached P-Card is believed to be getting used to circumvent the State Contracts put in place for the items on them. I glanced at them, but haven't researched all of the items to insure [sic] there are contracts. I was told to solicit your opinion on the situation." *Birch Decl.*, Ex. W at 1, Dkt. 50. Mr. Urquhart responded the same day, and confirmed that "[a]ll of those items should have been purchased on statewide contracts." *Id.* He directed Mr. Cryer to "escalate this" to Joni Booth, the Financial Executive Officer at IDOL and Mr. Cryer's supervisor at that time. *Id.*; *Amend. Compl.* ¶ 12; *Ans.* ¶ 2; *Engstrom Dep.* 38:4-5, Dkt. 47-7.

On December 10, 2015, Mr. Cryer sent an email to Eric Beck, copied to Joni Booth, stating that several recent purchases did not comply with DOP rules. *Birch Decl.*, Ex. AA, Dkt. 50-3. He explained that they were "not purchased off of the State contract," "[n]o prior authorization was given to acquire via an emergency purchase," and [t]here was no documentation for the emergency purchases." *Id*. He further stated that "In the future, all purchases in the open market of products that are on the state contract will

have the payment held until a written explanation for not following state purchasing rules is provided. If no written explanation is received, no payment will be made and the item or items will need to be returned to the place of purchase." *Id.*

## B. *Anonymous Emails*

Between December 24, 2015 and April 26, 2016, Mr. Cryer sent seven anonymous emails to various IDOL employees and other state officials. *See Birch Decl.* Ex. EE, Dkt. 52-1. On December 24, 2015, Mr. Cryer sent an email to Defendant Engstrom titled "Michael Kalm." *Id.* at 1. The email stated:

> I hope you dont [sic] sit back and allow Mr [sic] Kalm to just hire his girlfriend who is about to be fired from admin. That would be asking for trouble. What happens when they break it off again? Could he remain objective? I think not. You should probably involve yourself in a hire that could bring some very negative attention to IDOL business.

*Id.* Mr. Cryer sent a second email to Defendant Engstrom on December 30, 2015, with the subject "Trouble at Labor." *Id.* at 2. The email stated:

> Where to start, my how it must look to the outside world. Wait. Maybe they havent [sic] heard yet. Mike Kalm interviews his girlfriend and one of the eight candidates for the CSO job so he can move to his CTO job. He interviewed with Larry Ingram? For a CSO? Dont [sic] you already pay a CTO Mark Mayer? Oh but there are dual development manages too! Lars Hansen and Brett Richards. Maybe one of them could have lateraled into CSO? Or you just let Eric mismanage all of it a little longer. You are losing respect of all the workers in IT. All the workers who have kept the boat afloat. Sad sad sad

*Id.*

Mr. Cryer sent an email titled "Idaho Department of labor hiring practices" to Susan Buxton, the Director of the Idaho Division of Human Resources on April 15, 2016. *Id.* at 3; *Kalm Dep.* at 148:9-10, Dkt. 51-8. The email stated:

> Has anyone ever looked at what labor is doing in its hiring practices, its
> compensation schedules and more importantly its bonuses for pet positions? What
> about hiring uncertified people for skilled positions? The unit in charge over there
> is weak andmanipulated [sic]. Its [sic] a mess what they are doing

*Id.* Then, on April 18, 2016, Mr. Cryer sent an email to Sarah Hilderbrand, the DOP

Administrator, titled "IDOL." *Id.* at 4; *Pl.'s Br.* at 19, Dkt. 45. The email stated:

> Do you realize what Labor is doing? What they are buying? They are over there
> buying equipment they dont [sic] need. Stuff they never use. They split orders,
> totally abuse P cards. Buying stuff on contract with P cards and skipping all
> protocol. They hired Rachel Zahn to navigate your rules, saying now they have
> "an in" since she is friends with Division of Purchasing. They laugh at your rules.

*Id.* Mr. Cryer sent a second email to Susan Buxton on April 25, 2016, with the subject

"Idaho Department of Labor." *Id.* at 5. The email stated:

> The Idaho Department of Labor is a hiring sham! Their IT unit headed by Mike
> Kalm because Eric Beck is an ineffective manager has runn amuck [sic]. Mike
> Kalm with the blessing of upper management has hired his best friend John Brown
> and his daughter Mackenzie Brown. He hired his girlfriend Rachel Zahn who took
> Mackenzie to internal HR to get her fired for sleeping with Rachels ex boyfriend
> [sic]. And now they are about to hire Elizabeth Graham a friend of theirs into yet
> another fabricated position. These 4 are already in charge of all security and there
> is not a one of them with a bit of experience or certification.

*Id.*

Mr. Cryer sent a third email to Defendant Engstrom on April 26, 2016, titled "You

had a chance." *Id.* at 6. The email stated:

> You could have fixed it, but you instead decided that people like "us" are the
> problem and not the jerk you have in place destroying the Legacy of IDOL.
> Instead of acting to put an end to the shit show, you shared the info with the driver
> of the clown car making a mockery of IDOL. You deserve everything you are
> about to get. The campaign has started to end it.

*Id.* A few minutes later, Mr. Cryer sent an email to Geri Murrey, the Human Resources

Manager at IDOL, with the subject "Hiring practices." *Id.* at 7; *First Amended Compl.* ¶

43; *Ans.* ¶ 23. The email stated: "I cant [sic] believe you are standing by and allowing the hiring practices to go on like they are for the Security department. Its [sic] a sham and will be exposed." *Id.* Mr. Cryer admits that he sent the emails. *Amend. Compl.* ¶ 49, 52.

## C. Termination

Defendant Engstrom placed Mr. Cryer on administrative leave on May 9, 2016. *Engstrom Dep.* 87:24-88:12, Dkt. 51-4. On June 14, Defendant Edmunds provided Mr. Cryer with a memorandum entitled "Notice of Contemplated Disciplinary Action." *Kelly Opposition Aff.* Ex. N ("NOCA") at 1, Dkt. 60-16. The memo stated that IDOL was authorized to dismiss Mr. Cryer for engaging in "[i]nsubordination or conduct unbecoming a state employee or conduct detrimental to good order and discipline in the agency." *Id.* (citing Id. Div. of Human Resources R. 14.04.01.190(e)). As grounds for dismissal, Defendant Edmunds cited Mr. Cryer's alleged threats to the Department and to Defendant Engstrom. *Id.* ("Based upon the facts outlined above and also those included in the attached emails, it appears that more than sufficient grounds exist for finding that you violated [the HR rule] by sending the April 26, 2016 email to Jay Engstrom and threatening both Mr. Engstrom and the Department."). The memo also referred to the other six anonymous emails, and all seven were attached as an exhibit. *Id.* Mr. Cryer was terminated on June 23, 2016. *Birch Decl.* Ex. MM at 1, Dkt. 52-9 ("Termination Notice"). The termination notice referred to the NOCA for the "basis and substance of the evidence supporting [the termination]." *Id*.

## 2.     Procedural Background

Mr. Cryer timely filed this action on December 7, 2016, alleging that his termination violated the Idaho Protection of Public Employees Act ("IPPEA") and the First Amendment. He also alleged that IDOL violated his Fourth Amendment rights by subpoenaing Verizon for information related to his IP address and cell phone number. Finally, Plaintiff alleged a state law claim for negligent infliction of emotional distress.

The parties filed cross-motions for summary judgment, and the Court heard oral argument on May 25, 2018. At the hearing, the Court denied Defendants' motion as to Plaintiff's First Amendment claims, finding that there were genuine issues of fact as to whether Defendants considered protected speech in terminating Mr. Cryer. The Court granted Defendants' motion as to Plaintiff's claim under the Fourth Amendment. Relying on *Smith v. Maryland*, 442 U.S. 735 (1979), the Court found that Plaintiff did not have a reasonable expectation of privacy in record information related to his cell phone number or IP address. The Court also granted Defendants' motion with regard to Eleventh Amendment immunity, but only to the extent that Plaintiff seeks damages against the Defendants. The Court denied Defendants' motion on Eleventh Amendment immunity as to any injunctive relief sought by Plaintiff. The Court also granted Plaintiff's undisputed motion as to Defendants' Seventeenth and Eighteenth Affirmative Defenses.

The Court reserved ruling on Defendants' motion with regard to Plaintiff's state law claims under the IPPEA and for negligent infliction of emotional distress. The Court also reserved ruling on Plaintiff's partial motion as to particular elements of his IPPEA and First Amendment claims. Finally, the Court reserved ruling on Plaintiff's motion

with regards to Defendants' Seventh Affirmative Defense. For the reasons described below, the Court will deny Defendants' motion for summary judgment on Plaintiff's state law claims. The Court will grant Plaintiff's motion with regard to the "adverse action" element under the IPPEA, and will deny the remainder of Plaintiff's motion.[2]

## LEGAL STANDARD

Summary judgment is appropriate where a party can show that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). One of the principal purposes of the summary judgment "is to isolate and dispose of factually unsupported claims . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). It is "not a disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id*. at 327. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). There must be a genuine dispute as to any *material* fact – a fact "that may affect the outcome of the case." *Id.* at 248.

---

[2] During the May 25 hearing, Plaintiff made an oral motion to substitute a claim under the Idaho State Constitution for his Fourth Amendment claims. The Court declined to take up the motion at that time, and directed Plaintiff to file an expedited written motion addressing the matter. Briefing on that motion was complete on June 15, 2018, and a separate decision shall be issued on that matter.

The evidence must be viewed in the light most favorable to the non-moving party, and the Court must not make credibility findings. *Id.* at 255. Direct testimony of the non-movant must be believed, however implausible. *Leslie v. Grupo ICA*, 198 F.3d 1152, 1159 (9th Cir. 1999). On the other hand, the Court is not required to adopt unreasonable inferences from circumstantial evidence. *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

When cross-motions for summary judgment are filed, the Court must independently search the record for factual disputes. *Fair Housing Council of Riverside County, Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001). The filing of cross-motions for summary judgment – where both parties essentially assert that there are no material factual disputes – does not vitiate the court's responsibility to determine whether disputes as to material fact are present. *Id.*

## ANALYSIS

### 1. IPPEA Claim

Mr. Cryer alleges that he was fired in violation of the Idaho Protection of Public Employees Act ("IPPEA"), Idaho Code §§ 6-2101 et seq. The IPPEA "protect[s] the integrity of government by providing a legal cause of action for public employees who experience adverse action from their employer as a result of reporting waste and violations of a law, rule or regulation." *Id.* § 6-2101. It prohibits employers from taking adverse action against an employee "because the employee . . . communicates in good faith the existence of any waste of public funds, property or manpower, or a violation or suspected violation of a law, rule or regulation adopted under the law of this state, a

political subdivision of this state or the United States," provided that such communication is "made at a time and in a manner which gives the employer reasonable opportunity to correct the waste or violation." *Id.* § 6-2104(1)(a) (the "Communications Prong"). It also prohibits employers from taking adverse action against an employee on the grounds that the employee "has objected to or refused to carry out a directive that the employee reasonably believes violates a law or a rule or regulation adopted under the authority of the laws of this state, political subdivision of this state or the United States." *Id.* § 6-2104(3) (the "Refusal Prong").

To establish a claim under the IPPEA, "a plaintiff must establish, by a preponderance of the evidence, that the employee has suffered an adverse action because the employee, or a person acting on his behalf engaged or intended to engage in an activity protected under section 6–2104, Idaho Code." *Patterson v. State Dept. of Health & Welfare*, 256 P.3d 718, 724–25 (Idaho 2011) (internal citations and quotations omitted). "Under Idaho's Whistleblower Act, a *prima facie* case for retaliatory discharge requires [the plaintiff] to show: (1) he was an employee who engaged or intended to engage in protected activity; (2) his employer took adverse action against him; and (3) the existence of a causal connection between the protected activity and the employer's adverse action." *Van v. Portneuf Med. Cntr.*, 330 P.3d 1054, 1059 (2014) ("Van II") (internal citation and quotation omitted).

This Court has previously determined that the traditional *McDonnell Douglas* burden shifting analysis applies to claims under the IPPEA at the summary judgment stage. *Brown v. City of Caldwell*, No. 1:10-CV-536-BLW, 2012 WL 892232 at *7 (D.

Idaho Mar. 14, 2012). Under *McDonnell Douglas,* once the plaintiff establishes a prima facie case, the employer may produce evidence that it discharged the plaintiff for a legitimate, non-retaliatory reason. *Dawson v. Entek Intern.,* 630 F.3d 928, 934–935 (9th Cir.2011). If the employer meets this burden, the burden then shifts back to the plaintiff to prove that the legitimate non-discriminatory reason the employer proffered is, in fact, a pretext. *Id.*

The Court finds that there is a genuine dispute of fact as to whether Mr. Cryer engaged in activity that is protected under the IPPEA. The Court further finds that there is a genuine dispute of fact as to whether Mr. Cryer was fired for engaging in protected activity, or whether he was fired for a legitimate, non-retaliatory and non-pretextual reason. As such the Court will deny Defendants' motion as to Plaintiff's IPPEA claims, and will deny Plaintiff's partial motion as to the protected activity element and the causation element of his prima facie case. The Court will grant summary judgment in favor of Plaintiff, however, on the question of whether IDOL took adverse action against him. Neither party disputes that terminating Mr. Cryer constitutes an "adverse action" for the purposes of his IPPEA claim. Plaintiff is therefore entitled to summary judgment as to the "adverse action" element of his IPPEA claim.

## A.     *Protected Activity*

For purposes of the IPPEA, an employee engages in protected activity when he communicates in good faith the existence of any actual or suspected waste or violation; or refuses to carry out a directive that the employee reasonably believes would result in a violation. *See* Idaho Code §§ 6-2104(1)(a), 6-2104(3). Suspected violations do not have

to be confirmed in order to qualify for protection under the IPPEA. *Van v. Portneuf Med. Cntr.*, 212 P.3d 982, 989 (Idaho 2009) ("Van I"). When waste or violations are merely suspected, however, the employee's suspicion must be objectively reasonable to bring him within the protection of the Act – subjective suspicion is not sufficient. *Black v. Idaho State Police*, 314 P.3d 625, 629 (Idaho 2013) (finding that for activity to be protected it must be in response to some predicate act by the employer that either actually constitutes a violation, or that an objectively reasonable person could suspect constitutes a violation). Additionally, to be protected under the IPPEA, an employee's communications must relate to an existing waste or violation, not a potential future one. *Van I*, 212 P.3d at 989.

An employee communicates in "good faith" "if there is a reasonable basis in fact for the communication." Idaho Code § 6-2104(1)(b). An employee does *not* communicate in good faith if the employee "knew or reasonably ought to have known that the report is malicious, false or frivolous." *Id*. Whether an employee communicates in good faith is a question of fact. *Black*, 314 P.3d at 628. Thus, "summary judgment is appropriate only if, after viewing the evidence in the light most favorable to [the non-moving party], reasonable minds could only conclude that the communication was malicious, false, or frivolous." *Id.* (citing *Curlee v. Kootenai Cty. Fire & Rescue*, 224 P.3d 458, 467 (Idaho 2008)) (internal citations omitted).

Finally, in order for a communication to be protected, it must be made in a manner that allows "the employer reasonable opportunity to correct the waste or violation." Idaho Code § 6-2104(1)(a). The Idaho Supreme Court has not further interpreted this phrase.

The Court finds, however, that communications must either be made up the reporter's chain of command, or to a person with authority over the person committing the suspected waste or violations, in order to be protected under the IPPEA.

### (1)     Purchasing Violations

Mr. Cryer alleges that his communications related to the purchase of the UPS are protected under the IPPEA. He also alleges that by refusing to purchase the UPS until it was on contract, he engaged in protected activity. The Court disagrees. While the evidence shows that Mr. Cryer received three requests to purchase the UPS, there is no evidence that Mr. Cryer received a directive to purchase the UPS, much less one that he refused to carry out. Indeed, the evidence shows that Mr. Cryer submitted the purchase requests despite suspecting the UPS was not on contract. Thus, there is no evidence that Mr. Cryer refused a directive to violate the purchasing rules, in such a way that his actions were protected under the IPPEA.

Nor were Mr. Cryer's communications related to the UPS protected under the IPPEA. Even if Mr. Cryer reasonably suspected that the IT department was purposefully attempting to circumvent the purchasing rules to obtain the UPS, there is no evidence that he communicated those suspicions to anyone with the authority to remedy them. For example, although Mr. Cryer suspected someone had falsified a document to make it look like the UPS was on the Dell contract, there is no evidence that he communicated this suspicion to anyone. Instead, when Mr. Cryer emailed Ms. West to confirm again that the UPS was not on contract, he indicated that Dell was the source of the misinformation, rather than anyone at IDOL. *Birch Decl.* Ex. N at 3, Dkt 47-14 ("Apparently Dell is

saying [the UPS] is part of their contract but I am not finding it."). It is not reasonable, therefore, to infer that his communications were sufficient to put Ms. West or anyone else at DOP on notice that the IT department was attempting to violate the purchasing rules.

Finally, Mr. Cryer's communications about the UPS were made before the item was purchased. Consulting an authority about whether a future purchase would constitute a violation does not constitute a protected communication under the IPPEA. *See Van I*, 212 P.3d at 989 (holding that the IPPEA only protects communications related to an existing violation, not a future one.)

Mr. Cryer next alleges that his refusal to purchase the cable constituted protected activity under the IPPEA. A reasonable jury could agree. Mr. Cryer testified in his deposition that he determined the cable was on a Dell parts contract. *Cryer Dep.* at 108:9-12, Dkt. 47-5. Although there is conflicting evidence as to whether the cable actually was on contract, at this stage, the Court must take Mr. Cryer's testimony as true.[3] When Mr. Cryer consulted Ms. Cameron at DOP, he was informed that most items on open contracts are "mandatory use," "regardless of dollar amount," and that "[t]here are statutory penalties (enforced against the individual employee) for failure to utilize an open contract, regardless of dollar amount." *Birch Decl.* Ex. U, Dkt. 49-6. A jury could

---

[3] Defendant Engstrom disagreed with Mr. Cryer that the cable needed to be purchased on contract, but it is not clear whether he disagreed that the cable was on the contract. *Birch Decl.* Ex. G at 78:21-79:5, Dkt. 47-7 ("Engstrom Dep."). According to Defendant Kalm, the cable was on contract as of December 1, 2015. *Kelly Aff.* Ex. E at 124:1-3, Dkt. 51-8 ("Kalm Dep."). DOP later informed John Taylor that the cable was not on contract, but this communication occurred after Mr. Cryer was terminated. *Birch Decl.* Ex. L at 31:9-13, Dkt. 47-12 ("Taylor Dep."); *Birch Decl.* Ex T, Dkt. 49-5.

(Continued)

reasonably infer from this evidence that Mr. Cryer suspected that purchasing the cable off-contract was a violation of state purchasing laws, and that his suspicion was reasonable, even if it eventually turned out to be unfounded.

Further, a jury could reasonably find that Mr. Cryer received a directive to purchase the cable off-contract, and that he refused to carry that directive out.[4] Despite knowing that Mr. Cryer believed the cable had to be purchased on contract, Defendant Engstrom testified that he told Mr. Cryer "Let's move this thing along if at all possible. Let's just get the cable and give it to him." *Engstrom Dep.* at 67:21-23, 78:21-79:5, Dkt. 47-7. Defendant Engstrom was the Chief Operating Officer of IDOL, and it is reasonable to infer that he could issue a directive to Mr. Cryer, an IDOL employee. *Org. Chart*, Dkt. 47-13. It is also reasonable, when considering his statement in the light most favorable to the Plaintiff, to interpret "Let's just get the cable and give it to him" as a directive to purchase the cable off-contract.

A jury could reasonably find that Mr. Taylor, the Chief Financial Officer at IDOL, also directed Mr. Cryer to purchase the cable off-contract. After receiving the complaint from Mr. Kalm, Mr. Taylor reprimanded Mr. Cryer for his tone, and told Mr. Cryer "[t]here's something wrong here" and "[y]ou don't understand something." *Cryer Dep*. at 109:21-110:7, Dkt. 47-5. Mr. Taylor also told Mr. Cryer to "work with our internal

---

[4] Mr. Cryer also claims that his communications related to the cable purchase are protected under the Communications Prong. Because the cable had not yet been purchased, however, and because it was eventually purchased through the state contract, any such communications would relate to a potential future violation, not an existing one. Communications relating to potential future violations are not protected under the IPPEA. *Van I*, 212 P.3d at 989.

customers." *Taylor Dep.* at 60:17-61:6, Dkt. 47-12. Taken in the light most favorable to Mr. Cryer, a reasonable inference can be drawn that these statements represented an implicit directive to purchase the cable off contract, even if it violated the rules.

Further, a jury could reasonably find that Mr. Cryer refused these directives. Mr. Cryer informed both Mr. Taylor and Defendant Engstrom that the cable had to be purchased on contract. *Cryer Dep.* at 109:15-19, Dkt. 47-5. When the cable was finally purchased, it ordered through the Dell contract. *Taylor Dep.* at 39:22-24, Dkt. 47-12. Thus, a juror could reasonably find that Mr. Cryer refused a directive to purchase the cable off-contract based on a reasonable suspicion that doing so would violate state law, and that his refusal constitutes protected activity under the IPPEA.

Finally, a jury could reasonably find that Mr. Cryer's communications regarding Mr. Beck's P-Card constitute protected activity under the "Communications Prong" of the IPPEA. The evidence shows that Mr. Cryer suspected that Mr. Beck's P-Card was being used to circumvent state contracts, and that the card was indeed used to purchase items that should have been purchased through state contracts. *See Birch Decl.*, Ex. W at 1, Dkt. 50. Thus, there is sufficient evidence from which a jury could find that Mr. Cryer's suspicions were reasonable, and that actual violations occurred.

Further, a jury could reasonably find that Mr. Cryer communicated the suspected violations to DOP, as well as to his own superior at IDOL, Joni Booth. *See id.* (email to Mr. Urquhart); *Birch Decl.*, Ex. AA, Dkt. 50-3 (email to Eric Beck, copied to Joni Booth). Though Mr. Cryer indicated that someone directed him to Mr. Urquhart, that does not necessarily negate the inference that Mr. Cryer was reporting a suspected

violation to DOP. *See Birch Decl.*, Ex. W at 1, Dkt. 50 (stating to Mr. Urquhart that "I was told to contact you."). Rather, it could simply mean that someone else informed Mr. Cryer that Mr. Urquhart was the proper person to contact regarding his suspicions. Nor does the fact that Mr. Cryer sought Mr. Urquhart's opinion mean that his email cannot have communicated an existing violation to Mr. Urquhart. *See id.* Unlike his emails regarding the UPS, Mr. Cryer's email does not expressly ask whether the purchases constitute violations. Further, it relates to purchases that had already been made, not future purchases. Thus, a reasonable jury could find that Mr. Cryer sought Mr. Urquhart's opinion on what to do about the suspected violations, rather than on whether the purchases violated the law. Finally, the email to Mr. Beck laid out clear steps for preventing future violations, such that a jury could reasonably find that Mr. Cryer communicated to DOP and IDOL in a manner that allowed them to address the violations. *See, e.g.*, *Birch Decl.*, Ex. AA, Dkt. 50-3. Thus, a jury could reasonably find that Mr. Cryer's communications related to the P-Card were protected under the IPPEA.

### (2)   **Anonymous Emails**

Five of Mr. Cryer's seven emails alleged that IDOL, and the IT department specifically, were engaged in improper hiring practices. *See Birch Decl.* Ex. EE, Dkt. 52-1. Although Mr. Cryer testified that he was "concerned about the violation of nepotism rules," he points to no specific personnel law, rule, or regulation that the alleged practices violated. *Cryer Dep.* 134:5-6, Dkt. 47-5. Nor does it appear that the employment

practices alleged by Mr. Cryer would violate Idaho nepotism laws.[5] Thus, even if Mr. Cryer subjectively suspected that IDOL was violating nepotism rules, no jury could conclude that his suspicion was reasonable. *See Black*, 314 P.3d at 629 (finding that for activity to be protected it must be in response to some predicate act by the employer that either actually constitutes a violation, or that an objectively reasonable person could suspect constitutes a violation).

A jury could reasonably find, however, that the five emails detailed hiring practices that constituted "waste of public funds, property or manpower," and are therefore protected under the IPPEA. Idaho Code § 6-2104(1)(a). The Idaho courts have not expressly defined activities that constitute "waste" under the statute, but the Court finds that hiring unqualified candidates, needlessly duplicating or creating new positions, improperly awarding bonuses, and making hiring and firing decisions based on personal relationships could each constitute waste of public funds and manpower.

Here, Mr. Cryer alleged in two of the anonymous emails that the IT department was creating and filling unnecessary positions. *See Birch Decl.* Ex. EE at 2, Dkt. 52-1 ("Mike Kalm interviews his girlfriend and one of the eight candidates for the CSO job so he can move to his CTO job. He interviewed Larry Ingram? For a CSO? Dont [sic] you

---

[5] Idaho Code § 18-1359(1)(e), for example, only bars state employees from engaging in quid pro quo schemes to hire direct family members. ("No public servant shall . . . appoint or furnish employment to any person whose salary, wages, pay or compensation is to be paid out of public funds or fees of office, and who is related by either blood or marriage within the second degree to any other public servant when such appointment is made on the agreement or promise of such other public servant or any other public servant to appoint or furnish employment to anyone so related to the public servant making or voting for such appointment.").

already pay a CTO Mark Mayer? Oh but there are dual development managers too!"); *see also id.* at 5 ("now they are about to hire Elizabeth Graham a friend of theirs into yet another fabricated position"). Mr. Cryer also alleged that "Mike Kalm with the blessing of upper management has hired his best friend John Brown and his daughter Mackenzie Brown" and that neither of them have "a bit of experience or certification." *Id.* at 5; *see also id.* at 3 ("Has anyone ever looked at what labor is doing . . . about hiring uncertified people for skilled positions?"). These emails were sent to Defendant Engstrom and Susan Buxton, the Director of Idaho Division of Human Resources, both of whom can reasonably be found to have authority over hiring practices by reason of their positions.

The Court notes that Defendants dispute some of the characterizations made by Mr. Cryer regarding his hiring concerns. For example, Defendants contest that Defendant Kalm hired Mr. Brown. *See Birch Decl.* Ex. C at 9:23-10:12, Dkt. 47-3 ("Brown Dep."). But, they do not appear to contest that more than one person held the same position at the IT department, nor did they offer any objective evidence to dispute Mr. Cryer's characterization of such positions as duplicative and unnecessary. Finally, Defendants have not rebutted Mr. Cryer's assertions that several employees in the IT department were not qualified for the jobs they held. Instead, Defendants merely argue that Mr. Cryer's suspicions were based on hearsay, and that his communications were motivated by malice. *See Def.'s Br.* at 21, Dkt. 51-1. The Court finds, therefore, that the question of whether Mr. Cryer's concerns about waste in hiring were objectively reasonable is in dispute, and must be resolved by the fact-finder at trial.

Finally, one of the anonymous emails alleged that the IDOL was violating purchasing rules, and purchasing unnecessary equipment. *See Birch Decl.* Ex. EE at 4, Dkt. 52-1. As discussed above, there is sufficient grounds for a jury to find that Mr. Cryer's suspicions related to purchasing violations were reasonable. Further, a jury could reasonably conclude that Mr. Cryer's email to Susan Hilderbrand communicated waste of public funds, as he alleged that IDOL was purchasing unnecessary equipment. Finally, a jury could reasonably find that Ms. Hilderbrand, the Administrator for the DOP, had the authority to correct violations involving falsifications on purchasing requests. Therefore, the Court finds that a jury could reasonably conclude that six of the seven emails constitute protected activity under the IPPEA.[6]

### (3) Good Faith

Defendants contend that even if Mr. Cryer's communications would otherwise be protected under the IPPEA, the record shows that the communications were made in bad faith and therefore they are not protected. For example, Mr. Taylor testified that Mr. Cryer could not explain to him why a purchase order from Mr. Kalm took longer to process than a similar purchase order for another employee. *Kelly Aff.* Ex. B 28:23-29:25, 41:10-13, Dkt. 60-4. Additionally, an accountant at IDOL testified that Mr. Cryer told her he planned to make an employee "jump through hoops" throughout the purchasing process. *Id. Aff. of Nancy Fulfer* at 2, Dkt. 60-21. Moreover, Mr. Cryer testified that he

---

[6] Although the April 26 email obliquely references violations alleged in other emails, it does not communicate any allegations of suspected or actual violations or waste. Thus, the Court finds that it is not protected under the IPPEA.

"did not appreciate" Defendant Kalm "on a personal level." *Kelly Aff.* Ex. I at 1, Dkt. 60-11. Mr. Cryer also testified that when he described "the jerk destroying the Legacy of IDOL" in his April 26 email, he was referring to Defendant Kalm. *Id.* The Court finds this evidence establishes a genuine issue of fact as to whether Mr. Cryer acted in good faith. It is not so overwhelming, however, that "reasonable minds could only conclude that the communication was malicious." *Black*, 314 P.3d at 628. Rather, the question of whether Mr. Cryer acted in good faith is a disputed issue of fact that must be resolved at trial.

**B.**     *Causation*

Causation is almost always a question of fact. *See, e.g.*, *Tahoe Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 34 F.3d 753, 756 (9th Cir. 1994), *amended*, 42 F.3d 1306 (9th Cir. 1994) ("a question of causation is preeminently a question of fact, to be decided after trial"); *Lies v. Farrell Lines, Inc.*, 641 F.2d 765, 770 (9th Cir. 1981) ("[c]ausation is generally a question of fact for the jury")). Here, the question of causation boils down to a single disputed fact – whether Mr. Cryer was fired solely on the basis of the April 26 email, or whether IDOL took into account activities protected under the IPPEA in deciding to terminate him. Resolving this issue will involve weighing the evidence and evaluating the credibility of witnesses, which the Court may not do at this stage, and therefore summary judgment is precluded.

**C.     Conclusion**

Because the Court has found that there are genuine issues of material fact as to whether Mr. Cryer engaged in protected activity under the IPPEA, and as to whether

IDOL fired him on the basis of protected activity, it will deny Defendants' motion for summary judgment on Plaintiff's IPPEA claim. For the same reasons the Court will deny Plaintiff's motion as to the first and third elements of his IPPEA claim. As discussed above, however, the Court will grant partial summary judgment to Plaintiff on the second element of his IPPEA claim, because it is undisputed that his termination from IPPEA qualifies as an "adverse action" under the statute.

**2.      Negligent Infliction of Emotional Distress Claim**

A claim for negligent infliction of emotional distress (NIED) in Idaho has five elements: (1) the existence of a duty, (2) a breach of that duty, (3) proximate cause, (4) damages, and (5) physical manifestation of the injury. *Sommer v. Elmore Cty.*, 903 F. Supp. 2d 1067, 1075 (D. Idaho 2012). Though "the mere termination of an at-will employee—without more—does not constitute the breach of a duty sufficient to support an NIED claim," violation of an independent legal duty may be sufficient to support such a claim. *Bollinger v. Fall River Rural Elec. Co-op., Inc.*, 272 P.3d 1263, 1274 (Idaho 2012); *Newell v. Farm Bureau Mut. Ins. Co. of Idaho*, No. 1:17-CV-00277-DCN, 2018 WL 1796531, at *2 (D. Idaho Apr. 16, 2018).

Defendants argue that they had no duty to Mr. Cryer sufficient to support his claim for NIED. The Idaho Supreme Court, however, has held that the IPPEA creates an independent legal duty sufficient to support an NIED claim. *Wright v. Ada Cty.*, 376 P.3d 58, 68 (Idaho 2016). Because Mr. Cryer's IPPEA claim survives summary judgment, Defendants cannot prove as a matter of law that they did not violate an independent legal

duty not to terminate Mr. Cryer. Accordingly, the Court will deny summary judgment to Defendants on Plaintiff's NIED claim.

**3.** **First Amendment Claim**

Public employees do not surrender their First Amendment because of their public employment. *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006). "Rather, the First Amendment protects a public employee's right in certain circumstances to speak as a citizen addressing matters of public concern." *Id.* The Ninth Circuit has established a "sequential five-step series of questions" to evaluate First Amendment retaliation claims: (1) whether the plaintiff spoke on a matter of public concern; (2) whether the plaintiff spoke as a private citizen or public employee; (3) whether the plaintiff's protected speech was a substantial or motivating factor in the adverse employment action; (4) whether the state had an adequate justification for treating the employee differently from other members of the general public; and (5) whether the state would have taken the adverse employment action even absent the protected speech. *Gibson v. Office of Attny. Gen. State of California*, 561 F.3d 920, 925 (9th Cir. 2009) (citing *Eng v. Cooley*, 552 F.3d 1062, 1070 (9th Cir. 2009).

The Court denied Defendants' motion for summary judgment on Plaintiff's First Amendment Claims at the May 25 hearing. There, the Court found that there were issues of fact as to whether Mr. Cryer's anonymous emails were protected under the First Amendment, and as to whether Mr. Cryer was terminated solely on the basis of the April 26 email, or whether he was terminated for engaging in protected activities. The Court

did not address Plaintiff's partial motion for summary judgment on his First Amendment claims, but will deny it here for substantially the same reasons.

Mr. Cryer moved for partial summary judgment as to the first three elements of his First Amendment claim: (1) whether his speech touched on a matter of public concern; (2) whether he spoke as a private citizen or a public employee; and (3) whether the relevant speech was a substantial or motivating factor in the adverse employment action. In considering Mr. Cryer's motion, however, the Court must look at the evidence in the light most favorable to the Defendants. Defendants argue that Mr. Cryer was terminated solely because of the April 26 email. At this stage, the Court must accept Defendants' statement as true. Thus, the Court must deny summary judgment to the Plaintiff unless the April 26 email contains speech that is protected under the First Amendment.

The Court finds as a matter of law that the statements made in April 26 email do not touch on a matter of public concern, and as a result, do not constitute protected speech. The plaintiff bears the burden of showing that he spoke on a matter of public concern. *Eng*, 552 F.3d at 1070 (Internal citations omitted). "Speech involves a matter of public concern when it can fairly be considered to relate to any matter of political, social, or other concern to the community." *Id.* (Internal citations omitted). Speech dealing with individual personnel disputes and grievances, and of no relevance to the public's evaluation of the performance of governmental agencies is not of public concern. *Id.* (Internal citations omitted).

While the statements made in the other emails may arguably provide information relevant to the public's evaluation of IDOL as an agency, the April 25 email merely

conveys Mr. Cryer's personal frustration and animus towards the Defendants Engstrom and Kalm, and makes vague threats of undefined consequences for being ignored. As such, it does not constitute speech related to the public's evaluation of IDOL, or even of Defendant Engstrom's performance, but rather deals with "individual personnel disputes and grievances." *Eng*, 552 F.3d at 1070. Thus, as a matter of law the statements made in April 26 email do not touch on a matter of public concern, and therefore do not constitute protected speech.[7] Because a jury could reasonably find that Mr. Cryer was terminated solely because of the unprotected Apr. 26 email, the Court will deny Plaintiff's motion for summary judgment on the first three elements of his First Amendment claim.

### 4.    Defendants' Seventh Affirmative Defense

Mr. Cryer moved for summary judgment on Defendants' Seventh Affirmative defense, which asserts that his termination was not motivated by any speech protected under the First Amendment.  As discussed above, there is a genuine issue of fact as to what speech was a substantial or motivating factor in Mr. Cryer's termination. Therefore, the Court will deny Plaintiff's motion for summary judgment on Defendants' Seventh Affirmative Defense.

### 5.    Defendants' Motion to Strike

A court may grant a motion to strike pursuant to Federal Rule 12(f) if the contested language constitutes an "insufficient defense or any redundant, immaterial,

---

[7] Nor does Plaintiff contend otherwise. Rather, he contests whether the April 26 email provides a reasonably sufficient justification for his termination standing alone. *See, e.g.*, *Pl's Resp.* at 17, Dkt. 61; *Pl's Reply* at 7-8, Dkt. 63.

impertinent, or scandalous matter." Fed. R. Civ. Proc. 12(f). Motions to strike, however, are generally "disfavored." 5C Charles Alan Wright and Arthur R. Miller, *Federal Practice & Procedure*, § 1380 (3d ed. 2012); *see also Colaprico v. Sun Microsystems, Inc.,* 758 F. Supp. 1335, 1339 (N.D. Cal. 1991), on reconsideration, No. CIV. 90-20610 SW, 1991 WL 207480 (N.D. Cal. July 1, 1991) ("[M]otions to strike should not be granted unless it is clear that the matter to be stricken could have no possible bearing on the subject matter of the litigation.").

Defendants move to strike Paragraphs 2, 29, 31, 33-36, 39, 41, 43-44, 52, 56-74, 78-80, 83-84, 93-96, 99-100, and 103 of Mr. Cryer's Statement of Undisputed Material Facts in Support of his Motion for Partial Summary Judgment and Exhibits P, T, U, Y, CC, DD, FF, HH, KK, NN, and OO to the Declaration of Erika Birch, along with any references to those paragraphs and exhibits in his supporting memorandum. *Motion to Strike*, Dkt. 59-1. Defendants argue that the evidence referenced in these submissions is either immaterial, or not properly supported in fact. *See id.*

The Court finds that Exhibit U (Dkt. 49-6) to the Declaration of Erika Birch is relevant to a material issue of fact. Exhibit U is an email exchange between Mr. Cryer and a DOP Purchasing Officer that is relevant to the disputed issue of whether Mr. Cryer communicated a suspected violation of the purchasing rules with regards to the UPS to someone with the authority remedy the violation. Thus, the Court will deny Defendants' motion as to Exhibit U on the merits.

Because the Court did not rely on the remainder of the challenged material, it makes no evaluation of its materiality or factual support at this time. Instead, the Court

will deny as moot the remainder of Defendants' Motion to Strike, without prejudice to Defendants to raise these issues in future proceedings in this matter.

### 6.    Plaintiff's Motion to Exceed Page Limits

Plaintiff asked for leave to exceed the page limits for his brief in support of his partial motion for summary judgment (Dkt. 48), and his brief and statement of facts in opposition to Defendants' motion for summary judgment (Dkt. 56). Finding good cause, the Court will grant Plaintiff's motions.

## ORDER

**IT IS ORDERED:**

1.    Defendants' Motion for Summary Judgment (Dkt. 51) is **DENIED**.

2.    Plaintiff's Motion for Partial Summary Judgment (Dkt. 45) is **GRANTED IN PART** and **DENIED IN PART** as follows: As to the second element of his IPPEA claim, whether Plaintiff suffered adverse action, the motion is **GRANTED.** In all other respects the motion is **DENIED**.

3.    Defendants' Motion to Strike (Dkt. 59) is **DENIED** without prejudice.

4.    Plaintiff's Motions for Leave to Exceed Page Limits (Dkt. 48, 56) are **GRANTED**.

DATED: July 30, 2018

B. Lynn Winmill
Chief U.S. District Court Judge